The next case on our calendar this morning is number 18, 1841 United States v. Chandler Good morning. Good morning. May it please the Court and Counsel, my name is Jameisa Drake and I represent Mr. Chandler. Weatherford and its progeny addressed the prosecution's use of trial strategy information. In Weatherford, there was no problem because the prosecution never learned about strategy. Not so here. But wait a minute, let's break this down. So you're saying that if a defendant in a criminal case decides to go on a TV show and talk about his trial strategy, the government has to wall off the assistance trying the case to make sure that they don't learn of and make use of the trial strategy? No, Your Honor, and certainly that's not what we have here. No, I know that's not what we have here, but it seems to me that's the import of what you're proposing, which is if the government cannot make use of, can't even really know about trial strategy, even if it is attained through a waiver of privilege. That is your position, right? Correct. So why is the talk show example that I've given any different? If a defendant or his lawyer is talking so broadly about trial strategy that it could reach jurors or potential jurors, then that is a different scenario. Of course, defendants and their lawyers broadcast their strategy to jurors directly during opening statements. What about a defendant who develops a strategy on his own without not having consulted with counsel and just announces it, shares it? I'm going to fight this. There's going to be DNA evidence. I'm going to say I wasn't there. I have a great alibi. But it wasn't developed in the consultation with counsel, and he's just speaking about it with trusted friends or on the TV program that Judge Sullivan has referred to. He's a welcome guest. Why does that implicate his constitutional rights, if the government makes use of that information? So I have several responses to that. The first is Weatherford addresses this. Weatherford talks about whether the information was learned through the use of an informant. It talks about how strategy information is squarely within the ambit of Sixth Amendment privilege, and I realize the government makes the argument in its papers that we don't know here where trial strategy emanated from, but that can't be dispositive to the question because both at the trial strategy and here now on direct appeal, that answer, who created the strategy, isn't knowable unless the defendant waives his privilege with respect to who came up with this, during confidential client communication. But I'm puzzled by all of this. If the defendant goes to his friend and neighbor and the neighbor says, gee, I'm sorry to hear you in trouble, and the guy says, oh, don't worry about it. I really did that crime, but I've got a great lawyer. He tells me he can get me off by this and that, and besides, I've already lined up a fake alibi. The neighbor is outraged at this and goes to the authorities. The authorities say, well, what have you got to tell us? He says, well, this is what the guy told me, and the first part, I really did it, can be admitted, but all the rest the government either has to stop the person as soon as he starts to say, but my lawyer told me, or even if he doesn't say, my lawyer told me, if he just says, I've concocted a fake alibi, I've lined up my girlfriend to swear that I was in another state at the time, that can't be heard by the government? So my response to that comes from Weatherford directly. But Weatherford, everything you cite in Weatherford is total dictum in the sense that Weatherford is a case where, because there was no invasion of any kind, the case is over. And the court speculates about, well, you'd have a stronger case here or a more difficult case if, and then lists a variety of other things. But certainly you can't hold up Weatherford as binding authority that anything really beyond what it said in the case, which was even when the government deliberately inserts someone into the defense camp who's an agent of the government, in effect, there's no violation unless that results in a revelation of trial strategy. That's basic. Isn't that basically Weatherford? Yes, but that is key. That does help to answer, I believe, Your Honor's question. There is no need for a defendant to demonstrate an antecedent violation of the attorney-client privilege, an antecedent violation of the rules of evidence, in order to be able to successfully mount a Sixth Amendment challenge. I agree that it's in dicta, but it's in United States Supreme Court dicta. We need not agree that whenever a defendant converses with counsel in the presence of a third party thought to be an ally, the defendant assumes the risk and cannot complain if the third party, and now I'll paraphrase, goes on to relay that information to the government. We need not agree because it is not dispositive to the analysis. If there were an antecedent violation of the attorney-client privilege, the defendant would rely on the rules of evidence for suppression, be no need to move to the Sixth Amendment claim. This Court and subsequent courts, the way in which they reach their decisions, address, in a way, this interplay between the attorney-client privilege and the Sixth Amendment. Take this Court's decision in Ginsburg. Why isn't there just a straight-up obvious waiver of attorney-client privilege? An attorney-client privilege exists to protect the privacy of communications, right? But if I have a conversation with my lawyer and I then go and tell anybody about what my lawyer told me, the privilege no longer exists, right? If I brought that person with me to the meeting and they weren't with the lawyer and the lawyer said, can you exclude this person? No, no, I want them here to hear this. That, too, could be a waiver of attorney-client privilege. There wouldn't be no privilege in that circumstance because the client did not respect the confidentiality. So at least as far as privilege law is concerned, I just don't see it. So why would the Sixth Amendment give a broader protection? Right, and to be clear, I'm not – I don't have the record under which I can argue attorney-client privilege. I mean we are – the government has made the point that the privilege was waived. Our point is that's not essential to the Sixth Amendment analysis. The way in which – And why would the Sixth Amendment protect the right of someone to keep the government from learning something that he himself disclosed to a civilian third party who was not working for the government? If I may. It is precisely because it's not simply the receipt of that information, which is what the ethical canons of confidentiality and rules of privilege are concerned about. It's the use of that information. And we see that here. The way in which the information was used by the government denigrates more than just the relationship a client has with his or her lawyer. But it denigrates the broader principle of the right to present a defense. It compromises this notion that – and here certainly it was pitched to the jury that this defendant contemplated all of these different ways to defend himself at trial and must be lying about all of that. Well, yeah. Well, there's no objection to that at trial, right? That is correct. There is an objection, but it's not clear what the basis for that is on the record, so I assume this Court will review as plain error. Okay. Thank you very much. You've reserved a couple minutes for rebuttal. Order for Mr. Kessler for the government. May it please the Court. My name is David Kessler. I'm an assistant United States attorney in the Eastern District of New York. I'm joined by my colleague, Kevin Trowell, and I was one of the attorneys who tried the case below in the District Court. It was not error, let alone plain error, to admit the limited testimony from the defendant's cellmate about his statements, the defendant's statements in jail. There was certainly no disclosure of any attorney-client privileged information to the government. The record doesn't even suggest that the information disclosed to the cellmate was privileged. Information is certainly within the defendant's knowledge, nor is there any other evidence in the record that the government somehow injected an agent into some counseled conversation or tried to invade, through the use of a government agent, any sort of defense strategy. So why is it relevant? I mean, if there had been an objection, what would be the argument as to the relevance of this? In other words, it wasn't a crime-fraud exception. There's no suggestion that it was the person who was going to make false statements. It was just a disclosure of how the defendant was going to deal with certain evidence, right? Yes. I mean, although, so two points. First, how he was going to deal with the evidence was lying because he also disclosed the truth, which is that the gun was his, the DNA was his. It wasn't transferred. It wasn't planted. And so the actual statements, there are really only two or three questions and answers about the DNA. They're on page 18 of our brief. And those questions and answers are intertwined with the cellmate's discussion of what the defendant said to him generally, all of which constitute his admissions of guilt that the guns were his, he committed the shooting, he did touch the guns. There's something like false exculpatory statements or these hypothetical projected false exculpatory statements, right? I mean, he says, I shot this guy. I used that gun. The government found the gun, but I can beat it, is basically what he's saying. So the I can beat it is some evidence that, what, of an anticipated future crime maybe. Is that a problem? No. I think it is certainly evidence of past guilt. I mean, potentially a future crime, but he wasn't being prosecuted for that. Certainly, obstruction evidence is routinely admitted in cases to prove past guilt. But I think also, Judge Sullivan, to your question, the statements are relevant to the question of guilt or innocence. And if you're asking a question of, you know, is there sort of a 403 question here about maybe these couple of questions about, a couple of answers about arguable strategy, maybe more prejudicial than they're worth given everything else, that certainly wasn't an objection made at the time. It wasn't an objection made during the testimony, during colloquies, during the testimony, after the testimony, at the end of the trial, or in a Rule 33 motion. That objection was never raised. At least the fake alibi evidence, I suppose, has to come in, because if the girlfriend went to the police or the agents or the prosecutor and said, I've been asked to lie about this, that kind of thing, as you say, is the kind of obstruction evidence that's routine. It's not clear to me why it should be different that the defendant himself tells somebody who's not an agent for the government and there's no Sixth Amendment messiah kind of problem that I asked my girlfriend to lie and she said yes, apparently. That's not explicit, but that's what he expects is going to happen. That's right. I agree. I think all of this basically comes back to Judge Sullivan's first question about the TV show. I was going to use a billboard and Times Square analogy. But I think the point is if a defendant chooses to make statements to a third party who is in no way a government agent and those statements are relevant and otherwise admissible, then they come in. And the Sixth Amendment just doesn't interfere with that at all. I mean, that's sort of the Sixth Amendment issue. And then on top of that, we also have the plain error standard, which is not in dispute here that this court should review for plain error. And so here there's a Seventh Circuit case, Hamilton, which is directly on point and talks, among other things, about how the sorts of restrictions the defendant is proposing here would act in derogation of the truth, which is the most important, at least one of the most important concepts in thinking about evidentiary issues. So there's a case squarely on point in the direction of the government. There is no case involving disclosure to a pure third party in the other direction. So that alone defeats plain error. And then in addition to that, as we've laid out in our brief, the defendant can't show prejudice, can't show that I think the result would reasonably be different or be reasonable to expect a different result. Had these couple of questions been omitted in light of all the other evidence and in light of the defendant's other admissions to the cellmate, like I did the shooting, which are not in question. Could you address the motion to suppress for a minute? I mean, Mr. Chandler had a diminished expectation of privacy given his supervised release status, I guess. But the government only needed reasonable suspicion to come in, and there seems to be ample basis for that. But exactly how broad is that? Were they entitled to search the whole residence based on information that he had been elsewhere dealing with drugs and maybe had a gun at the uncle's house? What were they entitled to do? I think the short answer to that is certainly in this case, yes. I'm flipping through the brief to find the specific statement of the search condition, but I think it was to search his residence upon reasonable suspicion of criminal activity or violation. Here, the search was for the sorts of things that might be in drawers or under mattresses or in closets, guns and ammunition. I thought the condition was to kind of visit, not necessarily to search. They need reasonable suspicion on top of that in order to search. Is that wrong? No, I think you're correct. I think there's sort of two different points. One is visit and look at things that are in plain view, and then another is search if there is reasonable suspicion. So we are, I think when we're talking about safes and under mattresses, we're in the reasonable suspicion part of the condition, not the visit and look at stuff in plain view. And reasonable suspicion would be provided by Mrs. Chandler's statements. Well, Mrs. Chandler's statements and then the defendant's prior criminal history. And, you know, Mrs. Chandler's statements were corroborated, I believe, in one of the three or four instances by her relative. I think it was her uncle who also said that he had seen Mr. Chandler with a gun. There was also corroboration, I believe, in police records that there had been this incident at the nightclub where Mrs. Chandler had said that the defendant had attacked someone with a pistol. So it's not just her statements. There are her text messages or Instagram messages. There is another witness. There is his criminal history. And all of that, Magistrate Judge Locke laid out, and then Judge Azraq accepted. As Ms. Drake points out in her brief, the issue is not only whether there is reasonable suspicion to think that the defendant is violating his conditions of probation, but in order to search, To my surprise, when I did some research on this, it seems there are other circuits that have said that there's probable cause to think that somebody keeps drugs or a weapon in his house. I thought that was only the rule for bombs. But your point would be that that is satisfied here, that there is a reasonable suspicion that someone who's running around with a gun would have it in his residence and someone who previously apparently has kept guns in his car might have it in this car. Whether or not that's probable cause, your position is there is reasonable suspicion that this is going to be a productive search, not just that he's violating the law. That's correct, and on pages 43 to 44 of our brief, we list cases from this circuit addressing not the probable cause question, but the reasonable suspicion question in the context of probation searches. And I believe every one of the cases we cite is an instance where there was action outside of the residence, and in some cases not even involving the defendant, and that gave rise under the circumstances to reasonable suspicion to search the residence. The facts here are certainly at least as good if not better. The cases from this circuit that you cite for that proposition, I believe, are all summary orders. Is that right? I think it is possible that Trurino is a public decision. So we do have a public opinion. That's right, although again, this office, we make the point that sometimes summary orders are still instructive. Sometimes summary orders are summary orders because the point seems so obvious. Exactly. And after there are three of them, one begins to wonder what basis we would have for saying we were wrong all these times, but yes. If there are no further questions, we'll rest on our brief. Thank you very much. Thank you. Ms. Drake, you've reserved two minutes for rebuttal. Thank you, Your Honor. I'll begin by addressing Hamilton, the case that the government relies heavily and says is the only case that's factually similar. The point that I would like to make about that case, it's nearly 30 years old, is that it was decided on the grounds of whether or not there was a violation of attorney-client privilege. The only portion of that decision that you could sort of squeeze to say contemplated the Sixth Amendment is this, and I'll just briefly read from it. To the extent that Mr. Hamilton urges us to adopt a prophylactic rule based not on the attorney-client privilege but rather on the need to maintain the adversarial nature of a criminal proceeding, we decline to do so. And then here's the important part. Any such rule would be in derogation of the truth much like the attorney-client privilege itself. My brother repeated this concept, that the attorney-client privilege facilitates a derogation of the truth. Just one second. Right before the material you read, the Court found that Mr. Hamilton had waived any attorney-client privilege when he voluntarily disclosed the confidential information to his cellmate. That's the circumstance we're talking about here, a voluntary disclosure to a cellmate and that being a matching two waiver, regardless of any other policy considerations about how we search for truth and what the attorney-client privilege does. So I think that's what they're relying on. I'm missing your point. No, I don't dispute that the factual setup is similar, if not the same. My point is that this decision is addressed not to whether there is a Sixth Amendment violation but whether there was a violation of the attorney-client privilege. And when the Court is talking about the attorney-client privilege, it does so in a way that we don't do today. So scholars would say this notion that the attorney-client privilege facilitates a derogation of the truth, they would call that the classical view of the attorney-client privilege. Courts today take a much more kind view of the importance of the attorney-client privilege and don't believe that it leads to the derogation of the truth but rather is necessary to facilitate the other panoply of constitutional rights. But if we struck from the Seventh Circuit opinion the words, much like the attorney-client privilege, we'd still be seeing the Court saying that doing this would derogate, in a situation where the attorney-client privilege has been waived, to adopt a separate rule, that these confessions to other people of a plan to advance various false theories would be in derogation of the truth and they're not going to do it. Now, we don't have to follow that. We could make our own decision about whether that makes sense. But it is a case that is strikingly on point. And at least when you're trying to make a plain error argument, it's kind of a problem. Well, as I say, the facts are the same, but the legal analysis is grounded in whether there is a violation of the rules of evidence, which is not the argument that I am advancing before this Court. But Hamilton relied on Weatherford, just as you are, and made a Sixth Amendment argument. He did, but again, the Court did not hold that there was a Weatherford violation. The Court held that there was no violation of the attorney-client privilege. And if I could just say a word about what is the truth here, because there's been much discussion about how my client was lying or was planning to lie. I assume that comes from the notion that the informant, Whithead's, testimony was actually true, and that the testimony of all of the other highly compromised witnesses that the defendant presented in support of its case was also true. Our point is that there can be no fair balancing of the evidence here, because the jurors were primed by virtue of the direct examination that we challenged to reject the defense arguments that the defendant ultimately advanced. If I may, just one final thought. Yes, one more minute. As I mentioned in my reply brief, the Department of Justice uses taint teams with some regularity. One area in which they do is monitoring conversations between attorneys and their clients from the Bureau of Prisons. They use a taint team, even though the courts have either said that those conversations are not privileged or the privilege has been waived. And they're doing it not out of the goodness of their heart, but DOJ documents, as I cite in my reply brief, reveal they're doing this because of Weatherford, which emphasizes my point that it is the use of strategy information which implicates the Sixth Amendment problem. Thank you very much. Thank you both for your arguments. You'll reserve decision.